## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CHERYL A. LAPKA

   *Plaintiff*,

*v.*

COMMISSIONER OF
SOCIAL SECURITY,

  *Defendant*.

_____/

CASE NO. 20-10035

HON. STEPHEN J. MURPHY III
DISTRICT JUDGE

HON. PATRICIA T. MORRIS
MAGISTRATE JUDGE

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 13, 14)

## I. RECOMMENDATION

Plaintiff Cheryl Lapka challenges Defendant Commissioner of Social Security's final decision denying her claim for Title II Disability Insurance Benefits ("DIB"). The case was referred to me for review. (ECF No. 3); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENYING** Plaintiff's Motion for Summary Judgment, (ECF No. 13), **GRANTING** the Commissioner's Motion, (ECF No. 14), and **AFFIRMING** the Commissioner's final decision.

## II. REPORT

### A. Introduction and Procedural History

Plaintiff's application for DIB was filed on July 26, 2017. (ECF No. 11, PageID.190.) For the purposes of DIB, she alleged she became disabled on June 28, 2017.

(*Id.*) The Commissioner denied the claim. (*Id.* at PageID.110.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on November 7, 2018. (*Id.* at PageID.60–94.) The ALJ issued a decision on January 29, 2019, finding that Plaintiff was not disabled. (*Id.* at PageID.44–55.) The Appeals Council denied review on December 9, 2019. (*Id.* at PageID.33–35.) Plaintiff sought judicial review on January 7, 2020. (ECF No. 1, PageID.1–3.) The parties have filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 13–15.)

### B.  Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions

of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

even if the reviewing court would decide the matter differently and even if substantial

evidence also supports the opposite conclusion." *Id.* at 286. (internal citations omitted).

### C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*,

475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result
> in death or which has lasted or can be expected to last for a continuous period
> of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is

determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing
> substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically determinable physical
> or mental impairment that meets the duration requirement . . . or a
> combination of impairments that is severe and meets the duration
> requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your
> impairment(s). If you have an impairment(s) that meets or equals one of our
> listings in appendix 1 of this subpart and meets the duration requirement, we
> will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional
> capacity and your past relevant work. If you can still do your past relevant
> work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual
> functional capacity and your age, education, and work experience to see if
> you can make an adjustment to other work. If you can make an adjustment

to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or] her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 11, PageID.55.) At step one, the ALJ found Plaintiff met the insured status requirements through September 30, 2021. (*Id.* at PageID.49.) Plaintiff had not engaged in substantial gainful activity from the alleged onset date of June 28, 2017. (*Id.*) At step two, the ALJ concluded that Plaintiff had the severe impairments of psoriatic

arthritis and fibromyalgia. (*Id.*) Plaintiff also had non-severe impairments of dermatitis, depression, and anxiety. (*Id.* at PageID.49–50.) These impairments did not meet or medically equal a listed impairment at step three. (*Id.* at PageID.51.) Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b) except for lifting up to 15 pounds occasionally and left/carry 10 pounds frequently; occasional postural activities but no climbing of ladders, ropes, or scaffolds; frequent reaching, handling, and fingering with the bilateral upper extremities; must alternate between sitting and standing at the workstation not more frequently than every 30 minutes; only occasional exposure to temperature extremes of heat and cold; and no exposure to unprotected heights and dangerous moving machinery.

(*Id.*) At step four, the ALJ found Plaintiff was unable to perform any past relevant work. (*Id.* at PageID.53.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy. (*Id.* at PageID.54.) This included packer, sorter, and inspector. (*Id.*) Accordingly, Plaintiff was found to be not disabled. (*Id.* at PageID.55.)

### E.    Administrative Record

#### 1.    Overview of Medical Evidence

##### a.    Progress notes

Starting in July 2016, Plaintiff presented to Dr. Boyce for a follow-up visit for her psoriasis. (ECF No. 11, PageID.299.) Her symptoms included erythema, itching, joint pain and stiffness, pain, redness, and scaling. (*Id.*) Plaintiff was treated with Methotrexate, and she stated she was clear and happy with the regimen. (*Id.*) Plaintiff also took Mobic for joint pain, and she had improvement to mild joint pain. (*Id.*) Plaintiff's physical

examination showed normal systems for general appearance, ambulation, and respiration. (*Id.* at PageID.300.) Regarding Plaintiff's psoriasis, Plaintiff was advised to decrease Methotrexate at that time. (*Id.* at PageID.301.) A follow-up appointment Plaintiff had in November 2016 noted her complaint of extreme joint pain. (*Id.* at PageID.288. *See also id.* at PageID.285 (January 2017 follow-up appointment); *id.* at PageID.281 (July 2017 appointment).)

In November 2016, Plaintiff presented to Dr. Lockard and complained of not feeling well, head congestion, and an eye issue. (*Id.* at PageID.315.) Her physical examination was normal (for general appearance, respiration, and cardiovascular), other than for redness/erythema of the eyes, ears, and throat. (*Id.* at PageID.316.) Plaintiff was prescribed medication (Cipro) and discharged. (*Id.*)

Between January and June 2017, Plaintiff underwent diagnostic imaging examinations. In January 2017, an x-ray of her left hip showed "[m]inimal degenerative changes" with apparent chronic changes of the lumbar spine. (*Id.* at PageID.322.) In February 2017, an x-ray of her right knee was unremarkable, and her left knee showed "Minimal degenerative spurring, patellofemoral joint." (*Id.* at PageID.323–24.) An x-ray of her left hand showed "At least mild-to-moderate degenerative changes at the carpal 1st metacarpal joint." (*Id.* at PageID.325.) In May and June 2017, an MRI of Plaintiff's pelvis showed mild nonspecific subchondral cystic changes, formation of pseudoarthrosis with the left sacral ala, and degenerative disc disease and facet arthropathy at L4-L5; also non-focal edema-like signal traversing the midline with the S3 and S4 segment, osseous prominence at the posterior aspect of the sacrum, and no muscle tear nor edema, and

degenerative disc disease at L4-L5. (*Id.* at PageID.326–27.) In June 2017, Plaintiff had a normal ultrasound following complaints of low-back lumps causing pain. (*Id.* at PageID.329.)

Following these diagnostic images as of February, Plaintiff continued with Dr. Lockard. In February 2017, Plaintiff presented with complaints of constant pain in hips and knees, and the pain affected her activities of daily living. (*Id.* at PageID.317.) Here, she was referred to a rheumatologist. (*Id.* at PageID.318.) The record here also noted existing prescriptions for Xanax and Norco. (*Id.* at PageID.317.) In June 2017, Plaintiff presented for back pain and cysts; she also reported that working was becoming difficult and that she was always cold and weak. (*Id.* at PageID.319.) Plaintiff further explained her symptoms could occur any time and are located in multiple joints. (*Id.*) She described her pain as throbbing, and the pain was 6/10 at best and 10/10 at worst. (*Id.*) She said the symptoms improved with rest, lying down, heat, and pain medication. (*Id.*) The plan for Plaintiff was to continue the present management. (*Id.* at PageID.321.)

Plaintiff presented to Dr. McIntosh as a new patient in May 2017. (*Id.* at PageID.330.) Plaintiff described her joint pain in her fingers, hips, back and toes. (*Id.*) Her psoriasis improved with treatment, but her pain has persisted or become worse. (*Id.*) She stated her illness affected her daily activities and working. (*Id.*) Plaintiff's physical examination showed no limitation in flexion, extension, or rotation for her shoulders (both), elbows (both), hip joints (both), and knees (both). (*Id.* at PageID.331.) Tenderness was noted in the PIP joint in both hands. (*Id.*) Movement in both knees was noted as painful with flexion beyond 45 degrees. (*Id.* at PageID.331–32.) There were multiple tender points

in subcutaneous nodules in the low-back area. (*Id.* at PageID.332.) Plaintiff's general appearance, respiration, cardiovascular system, neurological system, and psychiatric system were normal. (*Id.* at PageID.331–32.) Plaintiff was referred to surgery for the nodules in the low-back area, and she was to start Cimzia after evaluation of the nodules and to continue Methotrexate. (*Id.* at PageID.333.)

Plaintiff presented to Dr. McIntosh in June 2017. (*Id.* at PageID.334.) She complained of joint pain in the PCP and MCP joints in both hands and of joint pain in both feet. (*Id.*) Physical examination showed tenderness on Plaintiff's PIP and MCP joints of the thumb and index finger. (*Id.* at PageID.335.) Plaintiff had tenderness over the joint at the first and fifth toe. (*Id.*) Plaintiff can make a fist. (*Id.*) Plaintiff's general appearance, respiration, cardiovascular system, and psychiatric systems were normal. (*Id.*) Plaintiff had a new diagnosis of fibromyalgia. (*Id.* at PageID.336.) Her prognosis was moderate. (*Id.*) Plaintiff's Cimzia plan was put on hold, and she was advised to use Cymbalta. (*Id.*) Plaintiff continued with Dr. McIntosh in July 2017 and complained of pain in her hands, feet, and low back. (*Id.* at PageID.345.) She felt that her symptoms were not improving. (*Id.*) Plaintiff continued to have tenderness in her hands, and normal general appearance and skin. (*Id.* at PageID.346.) Plaintiff was advised to consider physical therapy for her low back, and she was started on Cimzia. (*Id.*) At an October 2017 appointment, Plaintiff noted her joint pain improved, but she reported constant aching of the upper trunk and lower body. (*Id.* at PageID.378.) Her physical examination noted no limitation and no pain in flexion and extension of all fingers. (*Id.* at PageID.379.) There was diffuse muscle tenderness of the trunk and upper and lower extremities. (*Id.*) Plaintiff's prognosis

continued to be moderate, and she was to continue her medications, Enbrel and Methotrexate. (*Id.* at PageID.380.) The record noted a trial of Lyrica. (*Id.*) At a November 2017 appointment, Plaintiff complained of joint stiffness and issues with fibromyalgia; she felt it was poorly controlled with treatment, she was anxious and depressed, and she experienced numbness and tingling in her shoulders, hands, and feet. (*Id.* at PageID.386.) These symptoms have started with taking Lyrica. (*Id.*) Plaintiff noticed psoriasis lesions. (*Id.*) Plaintiff's physical examination showed restricted shoulder movement with flexion, extension, and elevation. (*Id.* at PageID.387.) There was no swelling, deformity, or atrophy in her shoulders. (*Id.*) She had painful movement at her elbows with flexion and extension, but no tenderness. (*Id.*) Plaintiff's medication was modified (increasing Methotrexate, continuing Enbrel, and discontinuing Lyrica), and her fibromyalgia will be reevaluated next time. (*Id.* at PageID.388.)

Returning to Dr. Lockard in September 2017, Plaintiff continued to report back pain and joint pain. (*Id.* at PageID.374.) She rated her pain at 6/10, and it was located in the low back, left/right upper extremities, and left/right lower extremities. (*Id.*) The pain was described as constant. (*Id.*) Her symptoms were exacerbated by standing and the weather, and they were relieved by rest, changing position, and medication. (*Id.*) She reported limitations in general activity, walking, work, housework, and sleep. (*Id.*) Her physical exam noted that she was alert, well appearing, and in no acute distress. (*Id.* at PageID.375.) In December 2017, Plaintiff continued to report general limitations, and pain was noted currently at 7/10 and it was maximum at 10/10. (*Id.* at PageID.485.) The pain was located in the neck and joints. (*Id.*) Plaintiff's physical exam noted she was alert, well appearing,

and in no acute distress. (*Id.* at PageID.486.) Dr. Lockard's impression stated that Plaintiff's pain control had been adequate. (*Id.* at PageID.487.) Plaintiff was partially meeting her functional goals of sleep and enjoyment of life. (*Id.*) Plaintiff has been compliant with treatment. (*Id.*)

Plaintiff was evaluated by Dr. Lazzara in December 2017. (*Id.* at PageID.400.) Examination showed that Plaintiff had trigger points in her feet, back, and knees. (*Id.* at PageID.401.) She had decreased grip strength bilaterally. (*Id.*) Plaintiff's grip strength on the Jamar meter was 12 pounds bilaterally. (*Id.*) She could pick up a coin, button clothes, and open doors. (*Id.*) Plaintiff had mild difficulty squatting and standing due to stiffness and pain. (*Id.*) A straight-leg raise test was negative, and she had no paravertebral muscle spasm. (*Id.*) Plaintiff's range of motion was within normal limits for cervical spine, elbows, hips, ankles, and fingers at the MP, PIP, and DIP joints. (*Id.* at PageID.402–04.) There was some limitation to her range of motion for her dorsolumbar spine, shoulders, knees, and wrists. (*Id.*) Plaintiff had normal reflexes at the biceps, triceps, knee, and ankle (*Id.* at PageID.404.) Plaintiff walked with a guarded gait, but she was stable enough to walk without assistance. (*Id.*)

Plaintiff continued to see Dr. McIntosh. In December 2017, Plaintiff continued with reports of joint pain and stiffness as well as joint deformities and swelling. (*Id.* at PageID.434.) Plaintiff complained of severe pain in the left radial wrist area. (*Id.*) Plaintiff felt her symptoms were moderately controlled with treatment. (*Id.*) She denied recent hospitalization or emergency room events. (*Id.*) Plaintiff's physical exam noted no limitation in the range of motion in her shoulders or left wrist. (*Id.* at PageID.435.)

Tenderness was noted in the first CMC joints. (*Id.*) Further, "Both the hands show no evidence of decreased range of motion, joint abnormality, weakness, numbness or other significant abnormal findings." (*Id.*) Plaintiff had a moderate prognosis and her medication was modified by increasing the Methotrexate. (*Id.* at PageID.436.) Plaintiff's follow-up visit in February 2018 showed similar complaints and examination, except that Plaintiff's shoulder movement was limited at passive elevation. (*Id.* at PageID.423–25.) In July 2018, Plaintiff's physical examination showed no limitation in flexion, extension, elevation, or rotation of Plaintiff's shoulders or elbows. (*Id.* at PageID.410.) Tenderness was noted in Plaintiff's elbows and knees. (*Id.*) Xeljanz was added to her medication. (*Id.* at PageID.411.) In September 2018, Plaintiff reported that her symptoms improved since Xeljanz was added to her treatment. (*Id.* at PageID.520.) Examination showed normal wrists and hands but noted diffuse muscle tenderness[1]. (*Id.* at PageID.521.) Plaintiff's prognosis was noted as good. (*Id.* at PageID.522.)

Returning to Dr. Boyce, in March 2018, Plaintiff described experiencing a lot of joint pain, but her psoriasis was well controlled. (*Id.* at PageID.504.) Plaintiff further stated she stopped working in June due to her pain. (*Id.*) Plaintiff stopped a medication (Enbrel), because of sickness, and she did not notice a change in her pain when taking it. (*Id.*)

---

[1] Specifically, the examination stated
> Both Wrists: Inspection of both the wrist joints reveals no erythema, swelling, symmetry, atrophy or deformity. No limitation is noted in palmerflexion, dorsiflexion, ulnar deviation, radial deviation, pronation or supination. Both Hands: Inspection of both the hands reveals no swelling, redness, nodules, deformity, atrophy, or asymmetry. Patient can make a fist. No limitation is noted in flexion and extension of all the fingers at the MCP, DIP and PIP joints. diffuse muscle tenderness.

(*Id.* at PageID.521.)

Plaintiff's physical exam showed normal general appearance, orientation, mood and affect. (*Id.*)

Returning to Dr. Lockard, Plaintiff continued with routine appointments throughout 2018. Plaintiff described minimum pain at 3/10, 6/10, 6/10, 8/10, 8/10, 8/10, with a maximum at 10/10. (*Id.* at PageID.452, 456, 462, 466, 469, 472.) The pain was constant, and described as either throbbing, dull and aching, tingling, or burning. (*Id.*) Plaintiff had normal physical exams where she was alert, well appearing, and in no acute distress. (*Id.* at PageID.464, 468, 470, 474, 478.) In June 2018, she was tearful and not answering questions appropriately. (*Id.* at PageID.461.) In July 2018, she was alert and in obvious discomfort. (*Id.* at PageID.458.) And she was in mild distress in August 2018. (*Id.* at PageID.454.) Regarding Plaintiff's chronic pain, her pain control was described as adequate, and that Plaintiff's functional goals have partially been met. (*Id.* at PageID.455, 464, 468, 471, 474, 478.) Plaintiff's pain control was described as inadequate in July 2018, but with no apparent change in medication at that time. (*Id.* at PageID.458.) Plaintiff received benzodiazepine medication for anxiety. (*Id.* at PageID.461.)

### b.    Other Diagnostic Images or Tests

In February 2018, an MRI of Plaintiff's cervical spine showed minimal Grade I anterior spondylolisthesis at C5-C6, encroachment upon the left neural foramen at C5-C6, and probable atherosclerotic calcifications. (*Id.* at PageID.488.) A March 2018 MRI cervical spine MRI showed facet arthritis at C5-C6 on the left, mild left neural foraminal narrowing at this level, no disc bulge or protrusion, and central canal cysts stenosis, and normal cord signal. (*Id.* at PageID.507.) In June 2018, an x-ray of Plaintiff's lumbar spine,

neck, and hip showed osteoporosis of the right hip and osteopenia of the lumbar spine. (*Id.* at PageID.509.)

### c. Medical Opinion

Dr. Lockard signed a letter, to whom it may concern, in June 2017, about Plaintiff "suffer[ing] from Fibromyalgia, Psoriatic Arthritis, and Trochanteric Bursitis. All of which cause moderate to severe pain that interferes with her daily living activities. At this time, [Plaintiff] is unable to perform any job functions." (*Id.* at PageID.343, 510.)

In August 2018, Dr. Lockard completed a medical source statement. (*Id.* at PageID.449–50.) He noted Plaintiff was diagnosed with psoriatic arthritis, neck pain, trochanteric bursitis, anxiety, and depression. (*Id.* at PageID.449.) Plaintiff had reduced range of motion in "nearly all joints." Plaintiff's anxiety and depression affected her functional limitations. (*Id.*) Plaintiff had a marked limitation on the ability to deal with ordinary work stress, and she could never lift/carry five pounds. (*Id.*) In an eight-hour workday Plaintiff could sit or stand/walk for zero hours. (*Id.* at PageID.450.) Plaintiff would need 30-minute breaks from work because of joint gelling. (*Id.*) Plaintiff could not occasionally grasp, reach, push/pull, manipulate, or use foot/leg controls. (*Id.*) Plaintiff could occasionally stoop or twist at the waist. (*Id.*)

Plaintiff's case was evaluated by Dr. Hagerty as the state agency doctor. (*Id.* at PageID.95–108.) Dr. Hagerty found Plaintiff's medically determinable impairments to be dysfunction of the major joints, fibromyalgia, dermatitis, inflammatory arthritis; all were severe. (*Id.* at PageID.100.) Plaintiff was found to have non-severe depressive/bipolar disorders. (*Id.*) There was a finding that the intensity of Plaintiff's symptoms is not

consistent with the totality of the evidence. (*Id.* at PageID.101.) Also, there was a finding that Plaintiff's statements about her symptoms are partially consistent with the medical and non-medical evidence in the record. (*Id.* at PageID.102.) In Plaintiff's RFC in this evaluation, Plaintiff was limited to occasionally lifting/carrying 20 pounds and frequently lifting/carrying 10 pounds. (*Id.* at PageID.103.) Plaintiff could stand/walk or sit for six hours of an eight-hour workday. (*Id.* at PageID.103–04.) Plaintiff could occasionally climb stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders. (*Id.* at PageID.104.) Plaintiff was limited in reaching, handling, and fingering to frequently instead of constantly. (*Id.* at PageID.104–05.) Plaintiff should avoid concentrated cold/heat and all hazards. (*Id.* at PageID.105.) Plaintiff was found to be not disabled, per the Medical-Vocational Guidelines. (*Id.* at PageID.106, 107.)

### 2.   Application Reports and Administrative Hearings

#### a.   Function Report

Plaintiff completed a function report on September 7, 2017 for her application for DIB. (*Id.* at PageID.251.) Plaintiff explained her conditions limit her ability to work because it takes time to get motivated, she cannot hurry to do anything, she is in constant pain and sore/tired all of the time, she has to sit and rest for 10–15 minutes after an hour and a half of work. (*Id.* at PageID.244.) With Plaintiff's daily activities, she described taking significant time getting out of bed and sitting, doing small tasks, napping throughout the day, and cooking dinner for the family. (*Id.* at PageID.245.) Plaintiff cared for other people by doing the chores she can, but she said they help her too. (*Id.*) Since her current condition, Plaintiff explained she takes more breaks now because of pain, and previously

she had more energy and muscle tone. (*Id.*) She also stated she is slow with personal care activities because of stopping for breaks, and she sometimes needs help buttoning or zipping certain clothing items. (*Id.*) She did not need reminders for personal care, but she used a reminder for Methotrexate medication that she takes once per week. (*Id.* at PageID.246.) Plaintiff prepared meals daily, but it takes a long time, and her husband helps. (*Id.*)

Plaintiff tried housework or yardwork, but it took extra time with breaks to sit or rest. (*Id.*) The time to complete these chores varies. (*Id.*) She needed encouragement to complete tasks. (*Id.*) Plaintiff tried to go outside every day. (*Id.* at PageID.247.) When she went out, she can drive a car and her husband drives for her. (*Id.*) Plaintiff indicated that she used to walk and ride a bike. (*Id.*) Plaintiff shopped in stores and by the computer for groceries and home items and things for her family. (*Id.*) She shopped every couple of weeks, and it took hours because she needed to take breaks and rest. (*Id.*) Plaintiff could pay bills, handle a savings account, count change, and use a checkbook. (*Id.*) She described her condition affected her work because, as a cashier, it was difficult to count change because of minimal grip. (*Id.* at PageID.248.)

Plaintiff's hobbies included reading, games, bike riding, and spending time with family. (*Id.*) She tried to do family-related things three times per week, and she tried to do the other things daily. (*Id.*) Plaintiff explained her condition limits how far she can ride her bike because of muscle pain. (*Id.*)

Plaintiff spent time with others through family and school events, but she spent most time at home because of her condition. (*Id.*) She did not need reminders to go places, and

she did not need anyone to accompany her. (*Id.*) Plaintiff did not have problems getting along with family, friends, or others. (*Id.* at PageID.249.)

Plaintiff stated her condition affected her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, and use her hands. (*Id.*) She further explained that she can lift about five pounds, that it takes her days to complete a task, that she has difficulties concentrating, and she loses grip with her hands. (*Id.*) Plaintiff said she can walk an eighth of a mile, and then rest for 10–15 minutes. (*Id.*) She can pay attention for half an hour, she does not finish what she starts, and spoken instructions need to be repeated. (*Id.*) Plaintiff gets along well with authority figures. (*Id.* at PageID.250.) Plaintiff handles stress better, with medication, and she can eventually adjust to changes in routine. (*Id.*)

Plaintiff's medications causes side-effects of tiredness, dry mouth, and loopiness. (*Id.* at PageID.251.)

### b. Third-Party Function Report

Plaintiff's husband Tim Lapka completed a third-party function report. (*Id.* at PageID.232–39.) He explained with Plaintiff's condition, she had a hard time walking, lost grip strength, lost muscle mass, she cannot stand for long periods of time, and she hurts all of the time. (*Id.* at PageID.232.) Before her condition, Mr. Lapka said Plaintiff could stand at her job all day and do house chores or yard work. (*Id.* at PageID.233.) He said her condition affected her sleep. (*Id.*) Her condition affected her abilities for personal care: her hands made it difficult to dress sometimes; it took her a long time to bathe; he helped her

wash and dry her hair; and she was always dropping things. (*Id.*) He said she needed reminders for personal care and to take medication. (*Id.* at PageID.234.)

He said she made meals that are sandwiches or from frozen foods. (*Id.*) He helped prepare food as much as possible. (*Id.*) She had difficulty lifting cooking items and she had to be able to sit down while preparing food. (*Id.*)

He said Plaintiff needed help with laundry for household chores because she cannot stand for any amount of time. (*Id.*) She needed encouragement to do chores because she had no muscle and her energy level was not very high. (*Id.*)

He said she went outside very little. (*Id.* at PageID.235.) She could drive and go out alone. (*Id.*) She could shop in stores for clothes and groceries, and she did this every couple of weeks for half of the day. (*Id.*)

He said Plaintiff could pay bills and handle a savings account. (*Id.*) Mr. Lapka said Plaintiff has a hard time counting change with no grip. (*Id.* at PageID.236.)

He said Plaintiff's hobbies included watching television and reading. (*Id.*) She spends time with others. (*Id.*) She needed reminders to go places, and she needed someone to accompany her. (*Id.*) Plaintiff did not have problems getting along with family or friends. (*Id.* at PageID.237.) He explained before Plaintiff's condition, they used to go camping and would garden a lot. (*Id.*)

Mr. Lapka said Plaintiff's condition affected her ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, remember, and use her hands. (*Id.*) She cannot lift five pounds, she cannot walk far, she cannot stand for long, and she has no grip. (*Id.*) She can walk for an eighth of a mile, and then stop and rest for about 15 minutes. (*Id.*) Her ability

to pay attention and follow instructions depended on the day. (*Id.*) She can finish what she starts. (*Id.*)

He said Plaintiff can handle stress, with her medication. (*Id.* at PageID.238.) Her ability to handle changes in routine depended on the day. (*Id.*)

Plaintiff takes medication that causes tiredness. (*Id.* at PageID.239.)

### c.   Plaintiff's Testimony at the Administrative Hearing

Plaintiff testified that she lives with her husband and adopted 10-year-old granddaughter. (ECF No. 11, PageID.65.) She said she can drive and does so about once a week. (*Id.*) Her husband does not work (he receives Social Security Disability insurance), and she receives Medicaid, food stamps, and an adoption subsidy. (*Id.* at PageID.66.) She has an associate degree as a medical assistant. (*Id.* at PageID.67.)

Plaintiff previously worked for Thumb Industries from 2003 to 2011. (*Id.*) She primarily moved boxes, donations, and racks of clothes. (*Id.* at PageID.67–68.) She stated she moved boxes of one-hundred pounds. (*Id.* at PageID.69.) Plaintiff was an Associate at Dollar General from 2011 to 2017. (*Id.*) There, she ran the cash register, stocked shelves, and cleaned. (*Id.* at PageID.70.)

Plaintiff was diagnosed with fibromyalgia. (*Id.*) She also has psoriatic arthritis, and she experienced improvement with treatment. (*Id.* at PageID.71–72.) Plaintiff has joint pain in her neck, shoulders, elbows, fingers, back, hips, knees, ankles, and feet. (*Id.* at PageID.72.) Her doctor, Dr. Lockard, restricted her to lifting no more than five pounds. (*Id.* at PageID.72–73.)

Plaintiff was able to take care of her personal hygiene care some days and her husband assists her also. (*Id.* at PageID.73.) She did laundry with assistance from her granddaughter, within the last eight months. (*Id.*) She said that her husband does most of the cooking. (*Id.*) She did not do work or hobbies outside. (*Id.*)

Plaintiff last worked at Dollar General in 2017, and she could no longer do all of the duties of the work, which involved twisting, bending, stretching, and use of grip. (*Id.* at PageID.75.)

Plaintiff testified that she usually did not do the dishes because it was too difficult to stand. (*Id.*) Plaintiff described how standing a certain way can immediately cause pain on her left side, from her back down to her knees. (*Id.* at PageID.76.) Plaintiff described how her granddaughter does most of the work of grocery shopping—loading and unloading the cart and scanning and bagging the groceries. (*Id.*) Plaintiff cannot blow dry her hair because she cannot hold her arms up long enough. (*Id.* at PageID.86.) She dropped things because of her poor grip strength. (*Id.*)

Plaintiff experienced morning stiffness, in her fingers, back, neck, and knees, and the stiffness lasts for at least two hours. (*Id.* at PageID.79–80.)

Plaintiff stated she goes to her granddaughter's school outings. (*Id.* at PageID.84.) There, she had problems with sitting in the auditorium or bleacher seats because of pain and having to shift everywhere. (*Id.*)

Plaintiff has tried medications for her psoriatic arthritis, but she said that they have not worked. (*Id.* at PageID.77.) Her pain medication, Norco, will work for her for a couple of hours. (*Id.*) Plaintiff experienced flare-ups of her psoriatic arthritis, and that includes

scaly rash, swelling, and intense pain. (*Id.* at PageID.78–79.) An arthritic flare-up could occur once a week and last for about an hour. (*Id.* at PageID.79.) It affected different joints and different times. (*Id.*) The psoriatic arthritis is worse for her in the winter. (*Id.* at PageID.80.) From her rheumatologist, Plaintiff had a bursitis diagnosis in her left hip, and there is an MRI that shows pseudoarthrosis in her pelvis. (*Id.* at PageID.82.) Plaintiff is also anemic. (*Id.* at PageID.83.)

Plaintiff stated her fibromyalgia remains about the same. (*Id.*) She experienced fibro fog. (*Id.*) Next, she said that medication, Xeljanz, has maybe helped with the psoriatic arthritis. (*Id.*)

Plaintiff took Pristiq and Xanax. (*Id.* at PageID.85.) She said that has led to emotional problems where she feels like a shell of a person. (*Id.* at PageID.86.)

### d. The Vocational Expert's ("VE") Testimony at the Administrative Hearing

The VE testified that Plaintiff's past work was identified as a retail clerk, a semi-skilled position with light exertion. (*Id.* at PageID.89.) The VE also testified that that is a composite job with stock clerk which is a semi-skilled position and with heavy exertion. (*Id.*) Plaintiff performed the work at the heavy level. (*Id.*) The ALJ inquired of a hypothetical individual of Plaintiff's age, education, and work history with the following assumptions

> the individual can perform light work as defined in the Regulations, however, they can only lift up to 15 pounds occasionally and 10 pounds frequently. Can only occasionally perform postural activities but no climbing of ladders, ropes, or scaffolds. They could frequently perform reaching, handling and fingering with the bilateral upper extremities. They would need the ability to alternate between sitting and standing at a workstation, however, not more

frequently than every 30 minutes. No more than occasional exposure to temperature extremes, that would be extreme heat and cold. And no exposure to unprotected heights or dangerous moving machinery.

(*Id.* at PageID.89–90.) The VE identified that the individual could not perform the past relevant work. (*Id.* at PageID.90.) The VE identified work the individual could do as packer, sorter, and inspector. (*Id.*) All the jobs were light, unskilled, SVP 2, and each had 50,000 jobs in the national economy. (*Id.*)

The ALJ also inquired of the same RFC limits at the sedentary level. (*Id.*) The VE said that there were no transferable skills from past work to transfer to sedentary work. (*Id.*)

Plaintiff's counsel inquired about the effect of reducing the hypothetical's limits to occasional reaching, handling, and fingering. (*Id.* at PageID.91.) The VE responded it would eliminate all jobs at the light and sedentary levels. (*Id.*)

The VE stated her testimony was consistent with the *Dictionary of Occupational Titles*, except that a sit/stand option and the limit of lifting 15 pounds at the light level were based on her experience. (*Id.* at PageID.92.)

### F.     Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)     Licensed physician (medical or osteopathic doctor);

(2)     Licensed Psychologist, which includes:

(i)      A licensed or certified psychologist at the independent practice level; or

(ii)     A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)     Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)     Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)     Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an

individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.*, § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

23

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*, § 404.1520c(c)(3). This factor will include the analysis of:

(i)     Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)     Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area

of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.*, § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single

analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.*, § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about

whether you are disabled or blind under our rules." *Id.*, § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.*, § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*, § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.*, § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms

can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.*, § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will

carefully consider any other information you may submit about your symptoms." This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*, § 404.1529(c)(3).

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account…We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

    (i)       [D]aily activities;

    (ii)      The location, duration, frequency, and intensity of . . . pain;

    (iii)     Precipitating and aggravating factors;

    (iv)     The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

    (v)      Treatment, other than medication, . . . received for relief of . . . pain;

    (vi)     Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.*, § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*, § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)     The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

### G.     Arguments and Analysis

#### 1.     The ALJ properly articulated his consideration of Dr. Lockard's medical opinion.

Plaintiff argues that the ALJ's decision fails to give good reasons for rejecting the opinion of Plaintiff's primary care physician Dr. Lockard. I suggest that Plaintiff is incorrect.

As a preliminary matter, it is necessary to state that Plaintiff's disability case was initially filed on July 26, 2017. (ECF No. 11, PageID.190.) Her case was filed after March 27, 2017, and accordingly, the evaluation of Plaintiff's case is not subject to the treating-source rule stated in 20 C.F.R. § 404.1527; formerly, "good reasons" was the explanation for the weight given to a treating source's medical opinion. Now, the ALJ must consider the medical opinions in the case and articulate their persuasiveness with the factors established by 20 C.F.R. § 404.1520c. Nevertheless, Plaintiff here appears to try to force the good-reasons analysis and precedent into the articulation requirement. At best, this is a form-over-function view of the regulations, where, in Plaintiff's words, there is the "same common thread between the old Regulation and new one. That is, there must be some articulation as to how the ALJ considered, and in this case rejected, the Medical Source Opinions by the treating family physician." (Pl. Reply, ECF No. 15, PageID.577–78.) Plaintiff does not appear to argue that Dr. Lockard's opinion be given a particular weight, which would be a function of the treating-source rule, but Plaintiff suggests by her argument that the ALJ failed to properly articulate his views on the medical opinion, thus "preventing the reviewing Court from tracing the ALJ's path of reasoning." (Pl. Br., ECF No. 13, PageID.546.) With this as the understanding, Plaintiff's argument fails, as follows.

The regulations state that no specific evidentiary weight will be given to any medical opinion or prior administrative medical finding, and that the persuasiveness of the opinion is considered through a number of stated factors, the most important being supportability and consistency. 20 C.F.R. § 404.1520c(a). Regarding Dr. Lockard's opinion, the ALJ stated

> The [Plaintiff's] treating physician, Dr. Richard Lockard, prepared a medical assessment on June 26, 2017, that indicated [Plaintiff] could not perform any work functions [ECF No. 11, PageID.343]. He also opined that the [Plaintiff] could not do any lifting, standing, sitting, or walking during the workday [ECF No. 11, PageID.449–50]. I find these medical opinions unpersuasive, as it exaggerates the severity of her limitations in comparison to the medical evidence of record, and lacks adequate support or detail.

(ECF No. 11, PageID.53.) This statement is in accord with another part of the regulations which permits multiple medical opinions from a medical source to be considered together with a single analysis; stated another way, "We are not required to articulate how we considered *each* medical opinion . . . from *one* medical source individually." 20 C.F.R. § 404.1520c(b)(1) (emphasis added). This statement is also in accord with identifying that the opinion was unpersuasive because it was not supported or consistent with the medical record. Clearly, the ALJ's statement above is cursory at that specific point in the decision, and while Plaintiff states a valid concern about the ability to analyze the decision via tracing the ALJ's path of reasoning, however, the opinions of Dr. Lockard here are patently deficient. A key feature of the supportability factor for persuasiveness is that with more relevant "objective medical evidence and supporting explanations presented by a medical source to support his or her medical opinion . . .", the more persuasive the medical opinion will be. 20 C.F.R. § 404.1520c(c)(2). When the ALJ states that the opinions lack adequate support or detail, there is nothing in the doctor's opinion that references objective medical evidence and supporting explanation.[2] Plaintiff does not further support her argument by

---

[2] While the Doctor's opinions either note various diagnoses or opine that Plaintiff cannot perform any work functions, these items alone do not develop Plaintiff's case. "[D]isability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it." *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)). Whether Plaintiff can work is an issue reserved to the Commissioner. 20 C.F.R. § 404.1520b(c)(3).

suggesting any objective medical evidence and supporting explanation from Dr. Lockard that is supportive to his opinions. (*See* Pl. Br., ECF No. 13, PageID.544. (Plaintiff references the existence of treatment notes without specifically identifying the relevant content therein.)) The medical record, as a whole, as the ALJ discussed, shows records of several doctor appointments that do not reveal or suggest limitations to the great extent that Plaintiff cannot perform *any* work functions nor perform *any* postural or exertional activities. The only source suggesting that particular limit is Dr. Lockard's opinion evidence.

Plaintiff's argument implicitly suggests reading the ALJ's articulation in isolation of the rest of the decision and the medical evidence of record, but the "Court reviews the record as a whole to determine whether the ALJ's decision is supported by substantial evidence." *Keeton v. Comm'r of Soc. Sec.*, F. App'x 515, 527 (6th Cir. 2014). While the ALJ's articulation was again cursory at that point of the decision, it nevertheless clearly follows the ALJ's description of Plaintiff's conservative treatment, her activities of daily living, her history of responses to medication, her examinations by doctors, her prognoses, and the opinions of her work-related limitations. The listing of these factors of the ALJ's decision, here, is not to reweigh or review the evidence *de novo*, but to articulate that the ALJ's decision on the matter of Dr. Lockard's opinion is, in fact, supported by substantial evidence. Using this same record evidence to arrive at a contrary conclusion would be reweighing the evidence, and "the court will not reweigh the evidence considered by the ALJ." *Seibert v. Comm'r of Soc. Sec.*, 2019 WL 147066 at *2 (E.D. Mich. 2019) (citing *Big Ranch Res., Inc. v. Ogle*, 737 F.3d 1063, 1074 (6th Cir. 2013)).

Plaintiff's analysis about the articulation of the (c)(3) factors for Dr. Lockard's relationship with the Plaintiff are not relevant, here, as Plaintiff does not cite to two medical opinions that were found to be equally persuasive. *See* 20 C.F.R. § 404.1520c(b)(3).

### 2. The RFC accurately described Plaintiff's manipulative limitations.

Plaintiff argues that the RFC failed to accurately describe her manipulative limitations. Plaintiff is incorrect.

The "RFC represents the most that an individual can do despite his or her limitations or restrictions." SSR 96-08. The ALJ is only required to include limitations within the RFC that are found to be credible. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). Plaintiff "retains the burden of proving her lack of residual functional capacity." *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008) (citing *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 392.)

In this case, the ALJ used the manipulative limitation of frequent reaching, handling, and fingering that was stated by Dr. Hagerty. (ECF No. 11, PageID.51, 104–05.) Plaintiff argues that this in conflict with Dr. Lockard's opinion that Plaintiff could not occasionally use her hands for simple grasping, reaching, pushing, pulling, or fine manipulation. (*Id.* at PageID.450.) Further, Plaintiff cites the record of her 12 pounds of grip strength and the records of joint pain and hand stiffness in Dr. McIntosh's records. Plaintiff claims that there is a discrepancy here in that the ALJ failed to resolve the conflict between the RFC and the more-restrictive limitations stated in Dr. Lockard's opinion.

The ALJ accurately described Plaintiff's manipulative limitations and considered the medical evidence of record and particularly the persuasiveness of the opinion evidence. Similar to the first argument, the ALJ appropriately explained the unpersuasive nature of Dr. Lockard's opinion. Next, both Dr. Lazzara and Dr. Hagerty recognized that Plaintiff's pain and stiffness caused mild difficulties, but neither suggested any limitation that was less than frequent manipulation; both considered Plaintiff's 12-pound grip strength. Finally, as to Plaintiff's complaints of severe wrist pain, the ALJ's decision and medical record note events of Plaintiff's tenderness in her hands, but also note Plaintiff's musculoskeletal and neurological examinations were generally normal or resulted in Plaintiff receiving conservative treatment. These items were considered and weighed by the ALJ. The ALJ resolved all alleged conflicts: He explained the persuasiveness of the medical opinion, recognized the decreased grip strength, and explained "[Plaintiff's] record of conservative treatment[3] does not corroborate the characterization of her symptoms as severe enough to render her disabled from all forms of work." (*Id.* at PageID.52–53.)

Plaintiff questions whether the ALJ properly considered times when Plaintiff was having flare-ups of psoriatic arthritis based on how the ALJ used or failed to use Dr. Lazzara's records. At best, this is speculative, as Plaintiff does not point to record evidence of any occurrences of flare-ups or how they would be significant to the outcome of this case. Plaintiff further suggests that her subjective increase in joint pain with treatment

---

[3] *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016) (citing cases where a history of conservative treatment undermined complaints of disabling pain or where receiving only conservative treatment was a good reason to discount a treating source's medical opinion).

(citing a subjective complaint of a visit note at a May 18, 2017 appointment with Dr. McIntosh; ECF No. 11, PageID.330) is contrary to reported lack of musculoskeletal or neurological limitations in the Dr. McIntosh's examination (*Id.* at PageID.331–32). However, record medical evidence shows "no limitation"-s as well as the tenderness/pain for Plaintiff's shoulders, elbows, hands, hips, and knees. I therefore conclude that the medical record was properly considered along with other record evidence in the case within the ALJ decision.

### H.    Conclusion

For these reasons, I suggest that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's Motion, (ECF No. 13), **GRANTING** the Commissioner's Motion, (ECF No. 14), and **AFFIRMING** the Commissioner's final decision denying benefits.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have

to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 4, 2021                                    S/ PATRICIA T. MORRIS
                                                         Patricia T. Morris
                                                         United States Magistrate Judge